IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CONSTRUCCIONES E
INSTALLACIONES
ELECTROMECANICAS S.A.,

    Plaintiff,

vs.

Case No. C2-07-234
Judge Edmund A. Sargus, Jr.
Magistrate Judge Terence P. Kemp

HI-VAC CORPORATION,

    Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Partial Summary Judgment filed by Defendant, Hi-Vac Corporation ("Hi-Vac"). Hi-Vac seeks dismissal of Counts One, Two, Three, Four, Seven and Eight of the First Amended Complaint filed by Plaintiff Construcciones E Instalaciones Electomecanica S.A. ("CIEMSA") asserting that no genuine issue of material fact exists and Hi-Vac is entitled to judgment as a matter of law with respect to all six of those claims.[1] For the reason that follows, the Motion is **GRANTED**.

---

[1] CIEMSA does not oppose the Motion as it relates to its state-law contract claims as set forth in Counts One, Two, Three and Four of the First Amended Complaint. These claims are, therefore, **DISMISSED** as preempted by the United Nations Convention on Contracts for the International Sale of Goods.

# I.

CIEMSA is a Uruguayan corporation that provides industrial and environmental services. CIEMSA provides operational and maintenance services to both public and private-sector clients. As it relates to this case, in 2004, CIEMSA entered into a contract with Montevideo, Uruguay to provide the municipality's public sewer and storm-water systems cleaning and maintenance services.

Hi-Vac is an Ohio corporation with its principal place of business located in Marietta, Ohio. Hi-Vac manufactures the Aquatech line of sewer cleaning equipment. The Aquatech delivers a stream of water into the sewer to dislodge material and vacuums to remove material from the sewer into a debris tank.

At the time it entered into the contract with Montevideo, CIEMSA had already acquired two standard Aquatechs for utilization in its sewer cleaning operations. In 1994, CIEMSA purchased a used Aquatech mounted on a Mack truck chassis; in 2001, it purchased a new Aquatech mounted on an International 4900 chassis.

The contract between CIEMSA and Montevideo contained specific requirements regarding the size and capacity of the equipment to be used to perform the job. The contract required a "super" sewer cleaning truck. A "super" unit performs the same basic functions as the standard Aquatechs that CIEMSA then had in its fleet, but required significantly higher performance specifications.

CIEMSA employed Pedro De Aurrecoechea as an engineer/Works Logistics Manager until March 2005. He was responsible for purchasing the super truck needed to fulfill the new contract with Montevideo. Mr. De Aurrecoechea worked with an International truck dealer in Uruguay and

with Hi-Vac regarding the design and selection of the super truck. He also provided the specifications, power, capacity and size requirements for the truck needed to fulfill the contract with Montevideo. CIEMSA asserts that Hi-Vac's Latin American representative, Fernando Rodriguez, represented to Mr. De Aurrecoecha that the company had designed and built similar trucks for other contractors in the past, and that it could build a truck to the specifications required in the Montevideo contract.

In November 2004, Mr. De Aurrecoechea traveled to Marietta, Ohio to meet with Hi-Vac personnel and to finalize the purchase contract for this super Aquatech unit. Mr. De Aurrecoechea and Patrick Snyder, Vice President of Sales for Hi-Vac, signed a handwritten contract dated November 17, 2004 which was later confirmed through an invoice issued by Hi-Vac and a purchase order issued by CIEMSA.

CIEMSA maintains that the super truck designed by Hi-Vac had design and engineering problems with the equipment on the power deck before it was shipped to Uruguay. The super truck was nonetheless shipped to CIEMSA and put into service in May, 2005.

CIEMSA asserts that it began to experience problems with the truck within thirty days of delivery. According to CIEMSA, it experienced thirty-three (33) failures or component breakages on the super truck during the pre-delivery period of March 3, 2005 through April 4, 2008, the majority of which relate to the water pump transmission and belts.[2] (Pl's Mem. in Opp., at 6-9, Exh. F.)

---

[2] A water pump, vacuum and drive system are mounted to the power deck of the super truck.

-3-

CIEMSA operated the equipment for a total of 8,234 hours through March 2008. (Senatore Dep., pp. 29-30; Ex. E, p. 38.) On average, the super truck provided CIEMSA with an excess of 55 hours per week, or 9 hours per day, of productive service during this period. The contract with Montevideo requires use of the truck for sixty-six (66) hours per week: two shifts of six (6) hours Monday through Friday, plus an additional shift on Saturday.

On September 17, 2005, the debris tank of the super truck tipped over when CIEMSA's workers attempted to empty it. CIEMSA inquired of Hi-Vac regarding the design of certain components of the Aquatech. As a result of the inquiries, Hi-Vac did additional calculations for a retrofit of the unit. In an internal analysis, Hi-Vac recommended a redesign of the power deck for the truck, including nearly doubling the shaft size for the water pump and suggested that CIEMSA fill the debris truck only half-full. CIEMSA contends that Hi-Vac never communicated these recommendations and never resolved the problems with the super truck.

CIEMSA maintains that it was forced to systematically lower the performance capabilities of the truck to keep it in service. It continues to operate the truck at specifications lower than those required under its contract with Montevideo.

CIEMSA filed a Complaint alleging various breach of warranty claims under state law, as well as breach of contract and avoidance under the United Nations Convention on Contracts of the International Sale of Goods ("CISG").[3] CIEMSA also asserts that Hi-Vac negligently misrepresented the technical capabilities of the super truck and provided false information, and fraudulently induced CIEMSA to enter into the contract for the purchase of the truck. Hi-Vac now

---

[3] Again, Plaintiff concedes that the treaty preempts its state law breach of warranty claims, and does not oppose Defendant's Motion as it relates to these counts.

-4-

moves for summary judgment on CIEMSA's claims in Count Seven for negligent misrepresentation and Count Eight for fraudulent inducement.

II.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment is proper if no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 617 (6th Cir.2001). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir.2000). A scintilla of evidence in support of the plaintiff's position will be insufficient; rather, evidence must exist on which the jury can reasonably find in favor of the plaintiff. *Liberty Lobby*, 477 U.S. at 252; *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000).

## III.

In its First Amended Complaint, CIEMSA alleges in Count Seven a claim for negligent misrepresentation:

> Defendant Hi-Vac was negligent and failed to exercise reasonable care and/or competence in obtaining and communicating to CIEMSA information respecting the technical capabilities and other technical aspects of the Truck prior to delivery and thereafter and as a result provided false information to Plaintiff CIEMSA as follows:
>
> a. Defendant Hi-Vac misrepresented its previous design and manufacturing experience, which led to its inability to properly design and manufacture the truck.
> b. Defendant Hi-Vac misrepresented the power and technical capabilities in regard to the fixation of the power deck to the truck chassis. Despite the representation of capabilities regarding the power deck supplied by Defendant Hi-Vac, the system designed for fixation of the power deck to the truck chassis was too rigid, causing severe deformations and stresses to the power deck that contributed to the breakage of several different components.
> c. Once the inadequacies of design regarding fixation of the power deck to the truck chassis were brought to the attention of Defendant Hi-Vac, it represented that the problem could be remedied. Despite these representations, Defendant Hi-Vac did not, in fact, design an adequate remedy for the power deck fixation problems. Ultimately, Defendant Hi-Vac recognized and admitted that it had misrepresented its capability regarding the repair of the design defect.

(Amend. Compl., ¶ 69.) In Count Eight, CIEMSA alleges fraudulent inducement:

> Defendant Hi-Vac made one or more representations material to the transaction at issue in this matter, specifically, the technical capabilities and technical aspects of the Truck and its prior design and manufacturing experience. Defendant Hi-Vac made these material representations with knowledge of their falsity and/or disregard or recklessness regarding their truth or falsity. Such misrepresentations include, but are not limited to, the following:

-6-

a. Defendant Hi-Vac misrepresented its previous design and manufacturing experience, which lead to its inability to properly design and manufacture the truck.

b. Defendant Hi-Vac purposely concealed the fact that the OMSI power take-off was inadequate for the specifications supplied to Hi-Vac. Specifically, the OMSI power take-off technical information sheets delivered to Plaintiff CIEMSA from Defendant Hi-Vac had sections of information concealed or obliterated so as to mislead CIEMSA to believe that the PTO met the technical specifications it had supplied.

c. Defendant Hi-Vac utilized incorrect transmission shift calculations for the purposes of misleading CIEMSA to believe the design that Hi-Vac had provided would meet the technical specifications required. Defendant Hi-Vac used incorrect physical dimensions, forces considered and other information in order to intentionally mislead Plaintiff CIEMSA into believing that the transmission shaft diameter used in the design could have the physical specifications.

d. Defendant Hi-Vac purposely entered inaccurate calculations into the Gates Poly Chain GT-2, belt calculation software in order to justify the design characteristics. Defendant Hi-Vac utilized the Gates software, as the software specifically determines the belts necessary for power requirements. Gates provides the software with clear indication regarding the types of machines used and the service factors involved in each case. The service factors inputted by Defendant Hi-Vac were deliberately under selected so as to decrease the power requirements for the belts. Should the correct efficiency and service factors have been inputted by Defendant Hi-Vac, the belts actually used in the Hi-Vac design would have been rejected by the Gates software.

(Amend. Compl., ¶ 74.)

Hi-Vac asserts that none of the misrepresentations alleged by CIEMSA supports a viable tort claim and that the parties' rights and responsibilities arise exclusively from their contractual relationship. The parties agree that Ohio law applies to the analysis of CIEMSA's tort claims.

Under well-established Ohio law, a plaintiff may not assert a tort claim based upon the same actions as those that form a claim for breach of contract. *See, e.g., Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981)("We recognized that a tort exists only if a party

breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed.") Generally, a tort claim, such as misrepresentation "cannot be predicated upon promises or representations relating to future actions or conduct." *Tibbs v. Nat'l Homes Constr. Corp.*, 52 Ohio App. 2d 281, 286, 369 N.E.2d 1218 (Ohio Ct. App. 1977). Although an action for fraudulent misrepresentation predicated simply upon a promise to perform that subsequently is unfulfilled will not stand, a plaintiff may establish a claim if the preponderance of the evidence demonstrates that, at the time the promise to perform was made, the promisor had no intention to fulfill the promise. *Resource Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 775 (N.D. Ohio 2004)(citing *Wall v. Firelands, Inc.*, 106 Ohio App.3d 313, 326, 666 N.E.2d 235 (Ohio Ct. App. 1995)). Thus, in order to establish its claims, CIEMSA must demonstrate that it was fraudulently induced to enter the contract for the super truck based on facts separate from those asserted to support its breach of contract claims.

Under Ohio law, negligent misrepresentation is defined as follows:

> "One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others, in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable* reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Delman v. Cleveland Heights*, 41 Ohio St.3d 1, 4, 534 N.E.2d 835 (Ohio 1989)(quoting 3 Restatement of the Law 2d, Torts (1965))(additional citations omitted). Similarly, the elements of a cause of action for fraudulent misrepresentation are as follows: (1) a material false misrepresentation or concealment; (2) knowingly made; (3) with intent of misleading another into relying on it; (4) reasonable reliance on the misrepresentation; and (5) injury resulting from the

-8-

reliance. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St. 3d 54, 55, 514 N.E.2d 709, 712 (Ohio 1987); *see also Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101, Syl. ¶2 (Ohio 1986)(same).

## A. Pre-Delivery Misrepresentations

In order to prove either its negligent or fraudulent misrepresentation claim, CIEMSA must show that it justifiably relied upon inaccurate information received from Hi-Vac in making the decision to purchase the super truck. CIEMSA asserts that Hi-Vac made misrepresentations prior to purchase of the super truck regarding its experience in the design and manufacturing of such equipment. This assertion, however, is not supported by the evidence.

CIEMSA was aware that building a prototype would be more risky than using existing equipment with which it had experience. Defendant has adduced evidence that, after being awarded the contract, CIEMSA sought to modify the specifications of its contract with the City of Montevideo so as to permit CIEMSA to purchase a standard Aquatech to fulfill its obligations. (De Aurrecoechea Dep., at pp. 98-102.) Mr. De Aurrecoechea testified that he thought, if possible, it would be better to use standard equipment, rather than designing a new truck because a prototype was subject to unknown problems. (*Id.*) When the City of Montevideo declined to modify the contract, CIEMSA proceeded to purchase the super truck with an appreciation of the risk involved.

In early 2003, Hi-Vac proposed that the sewer cleaning equipment be mounted on an International 5600 cab and chassis with a gross vehicle weight rating ("GVWR") of 66,000 pounds. (De Aurrecoechea Dep., pp. 50-53.) De Aurrecoechea, the CIEMSA mechanical engineer responsible for acquiring the equipment, consulted with an International truck dealer in

Uruguay and then selected an International 7600 with a GVWR of 60,000 pounds. (De Aurrecoechea Dep., pp. 126-127.)

CIEMSA does not deny that Mr. De Aurrecoechea rejected Hi-Vac's recommendations regarding the design of the super truck. CIEMSA contends, however, that Hi-Vac's engineer, David Clinger, had serious misgivings regarding several aspects of the design but never communicated them to CIEMSA prior to delivery of the truck. It maintains that it discovered these design flaws and Hi-Vac's knowledge of them during the course of this litigation.

In support of its assertion that Hi-Vac concealed its design concerns, CIEMSA submits the affidavit of Daniel Senatore. He avers, *inter alia*, that "[a]t no time did Hi-Vac communicate to CIEMSA any concerns regarding the chassis that was selected for this truck or voice any concerns about the wheel base, axles or weight distribution." (Senatore Aff., ¶ 2.) Mr. Senatore, however, has no personal knowledge of the pre-delivery conversation that occurred between Hi-Vac and Mr. De Aurrecoechea. He first learned that CIEMSA was purchasing the truck in February 2005 and had no formal involvement until the tip-over accident in September 2005. He could not have known about the discussions between De Aurrecoecha, Rodriguez or any other Hi-Vac representative prior to finalization of the contract. This paragraph of Senatore's affidavit, therefore, does not comply with Federal Rule of Civil Procedure 56(e)(1).

In fact, David Clinger testified as follows:

Q. And did you make a recommendation for the 7600?
A. The wheel base, the CA and the AF, my recommendations wouldn't have changed. Pedro [De Aurrecoechea] did not want the truck built the way we wanted to build it. He wanted it built like this.
Q. . . . [W]hat was your problem with this truck?

\* \* \* \*

|   |   |
|---|---|
| A. | It has – first of all, the weight distribution is not quite 100 percent correct. With axle factor to the rear, you get better weight distribution. You get more weight to the front. On a truck such as this, I would be looking for fourteen to 16,000 pounds on the front end, on the front axle, which could not be done according to their specifications. |
| Q. | And apparently you knew that? |
| A. | Yes. |
| Q. | So you basically knew that you were building a truck, engineering a truck, that had bad weight distributions? |
| A. | I did not – we discussed this when Pedro [De Aurrecoechea] came in in October that this was bad. It was not what we would want to build and he insisted that this is the way it is. This is the chassis. This is the way I want to build it. |

(Clinger Dep., pp. 125-126.)

This evidence undermines CIEMSA's assertions that it justifiably relied upon any representations regarding Hi-Vac's previous design and manufacturing experience in making its decision to purchase the super truck. Furthermore, CIEMSA has not factually demonstrated that Hi-Vac falsely represented that it had previously designed and built similar trucks for other customers.[4] Indeed, the evidence reveals that Hi-Vac had previously designed and built special, higher-than-standard- capacity Aquatechs for other customers.[5]

CIEMSA has failed to adduce evidence to demonstrate that it justifiably relied on Hi-Vac's alleged pre-contract misrepresentations. Summary judgment is, therefore, appropriate for this

---

[4] CIEMSA contends that David Clinger's deposition testimony demonstrates that Hi-Vac had never designed and built similar trucks. The citation to Clinger's deposition transcript, however, does not support this position. As Hi-Vac points out, Clinger was not asked if Hi-Vac had previously built a truck "similar" to the super truck. He testified that the design for the power deck was unique and that Hi-Vac had not previously built a power deck to accommodate exactly the same blower and pump that CIEMSA had ordered. (Clinger Dep., pp. 18-26.)

[5] Hi-Vac had supplied special B-15 Aquatechs to both Lake County, a company owned by a Mr. Marucci, and to a business owned by a Mr. Walsh. (Rodriguez Dep., pp. 53-57 & 88-92.) CIEMSA has not come forward with any evidence to dispute these assertions.

-11-

aspect of Counts Seven and Eight of CIEMSA's Amended Complaint for negligent and fraudulent misrepresentation.

## B. Post Delivery Misrepresentations

CIEMSA contends that Hi-Vac made material misrepresentations and concealed information after delivery of the truck to induce CIEMSA to take no action to vitiate the contract until after the one-year warranty period had expired. CIEMSA contends that it continued to rely on Hi-Vac's post-delivery representations that the super truck could be repaired so as to conform to the specifications of the purchase contract.

CIEMSA's rights under the warranty, however, do not depend on it taking corrective certain action within the one-year warranty period. As Hi-Vac points out, if an event giving rise to a valid claim occurred the day before the limited warranty expired, then Hi-Vac would still be liable after the expiration of the warranty term. Moreover, the record demonstrates that Hi-Vac continued to meet with CIEMSA in late October 2006, after the limited warranty had expired, to address CIEMSA's concerns.

CIEMSA repeatedly characterizes Hi-Vac's communications regarding design issues as misrepresentations.[6] These matters, however, are more properly analyzed as part of CIEMSA's breach of contract claims. For instance, Count Five, for breach of contract, CIEMSA asserts that the super truck was "was nonconforming because it was not of the quality and description required

---

[6] CIEMSA submitted several unauthenticated email messages between Hi-Vac engineers in which Hi-Vac acknowledges the problems CIEMSA was experiencing with the super truck and their views regarding appropriate corrective measures. CIEMSA characterizes these communications as Hi-Vac's attempts to conceal design defects. As set forth above, this evidence relates to CIEMSA's breach of contract claims and, if properly authenticated, may be useful to the trier of fact as it relates to the assertion that the truck was non-conforming and not fit for its ordinary or particular purposes.

by the contract, was not fit for the purpose for which a Truck of the same description would ordinarily be used and/or was not fit for the particular purpose expressly and/or impliedly made known to Defendant Hi-Vac . . . ." (Amend. Compl., ¶ 58.)[7] Clearly, the parties contest many issues related to the design of the super truck and the reasons it failed to perform to CIEMSA's expectations. CIEMSA's post-delivery misrepresentation claims, claims, however, are mere re-characterizations of its chief cause of action that Hi-Vac breached the contract by failing to appropriately design and manufacture the super truck to its specifications. These are matters for the jury to weigh and discern when it assesses whether CIEMSA lost the benefit of its bargain and whether Hi Vac breached the contact. These are not separate claims arising independently of CIEMSA's causes of action breach of contract.

## IV.

For the foregoing reasons, Hi-Vac's Motion for Partial Summary Judgment as to Counts Seven and Eight (Doc. 30) is **GRANTED**. By agreement of Plaintiff, its state-law contract claims as set forth in Counts One, Two, Three and Four of the First Amended Complaint are **DISMISSED**. This case will proceed to trial as to Plaintiff's remaining claims.

**IT IS SO ORDERED.**

7-24-2009
DATED

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE

---

[7] In Count Six, CIEMSA asserts that Hi-Vac's failure to perform in conformity with the contract entitled CIEMSA to revoke and avoid the contract.

-13-